**SO ORDERED.**

**SIGNED this 2 day of April, 2021.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 19-00778-5-DMW |
| **SUSAN PURVIS HOLLAN** | |
| | CHAPTER 7 |
| **DEBTOR** | |
| **MARJORIE K. LYNCH, UNITED STATES BANKRUPTCY ADMINISTRATOR and KASPERS AND ASSOCIATES LAW OFFICES, LLC** | |
| **PLAINTIFFS** | **ADVERSARY PROCEEDING NO.** |
| vs. | **19-00162-5-DMW** |
| **SUSAN PURVIS HOLLAN** | |
| **DEFENDANT** | |

**MEMORANDUM OPINION DENYING DISCHARGE**

This matter comes before the court upon the Second Amended Complaint filed by Marjorie K. Lynch ("BA"), United States Bankruptcy Administrator for the Eastern District of North Carolina and Kaspers and Associates Law Offices, LLC ("Kaspers") (collectively "Plaintiffs") on July 3, 2020, seeking the denial of a discharge to Susan Purvis Hollan ("Defendant") pursuant to 11 U.S.C. §§ 727(a)(3), 727(a)(4)(A), 727(a)(4)(D), 727(a)(5) and 727(a)(6)(A). The court

conducted a trial on January 21-22, 2021 in Raleigh, North Carolina. Brian C. Behr, Esq. appeared for the BA, Stephanie E. Goodbar, Esq. appeared for Kaspers, and Philip Sasser, Esq. appeared for the Defendant. The court entered a Judgment in favor of the Plaintiffs. Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure,[1] this opinion sets forth the court's findings of fact and conclusions of law in support of the Judgment.

FINDINGS OF FACT

Prior to the trial, on December 18, 2020, the court entered a Final Pretrial Order in which the parties stipulated to several facts relevant to the proceeding. At the trial, the Plaintiffs called the Defendant, William H. Flowe, Jr., William A. Thomas,[2] and William Kaspers to testify. The court admitted into evidence forty-five exhibits and video testimony from the depositions of William Teague and Garrinette Teague introduced by the Plaintiffs. The Defendant also testified on her own behalf, and the court admitted into evidence six exhibits introduced by the Defendant in support of her testimony. Based upon the stipulations contained in the Final Pretrial Order and the evidence presented at trial, the court finds the facts relevant to its ruling[3] to be as follows:

Defendant's Bankruptcy Case

On February 21, 2019, the Defendant filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.[4] The Defendant's schedules reflect that at the time of the petition, the Defendant had $400.00 cash, $1,603.47 on deposit in bank accounts, and $525.19 in

---

[1] Made applicable to adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure.
[2] The court admitted Mr. Thomas as an expert in the area of residential real estate appraisals in Alamance County, North Carolina.
[3] The court declines to make any findings of facts not relevant to its conclusions of law, specifically facts concerning certain real estate transactions which are the subject of another adversary proceeding pending in the Defendant's bankruptcy case.
[4] Except for within formal citations, references to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will be by section number only.

2

a health savings account. The Debtor scheduled nonpriority unsecured claims totaling $392,790.45, including a disputed claim of Kaspers for $200,000.00.

Defendant's Alleged Debt to Kaspers

In September 2013, the Defendant retained Kaspers, a law firm located in Atlanta, Georgia, to represent her under an open account agreement regarding her recent termination of employment with Web.com Group, Inc. ("Web.com"). On February 14, 2014, the Defendant initiated a civil action ("Employment Action") against Web.com in the United States District Court for the Northern District of Georgia ("USDC").

After initiation of the Employment Action, in March 2014, the Defendant and Kaspers entered into a written Retainer Agreement which included provisions for Kaspers' attorneys' fees and expenses, retroactive to the commencement of their open account agreement. The Retainer Agreement outlines a "hybrid" fee arrangement under which the Defendant is obligated for actual fees incurred at reduced hourly rates if fees not awarded in the Employment Action, actual fees incurred at normal hourly rates if fees awarded in the Employment Action, and a contingency commission on any recovery in the Employment Action exclusive of fees. The Retainer Agreement also obligates the Defendant to pay all costs and expenses associated with the Employment Action. Pursuant to the Retainer Agreement, the Defendant paid a $3,000.00 retainer to Kaspers and agreed to make monthly payments of $150.00, the maximum amount she represented she could afford to pay at that time.

In July 2015, the USDC dismissed the Employment Action. On or about November 3, 2015, Kaspers sent the Defendant a letter asserting that the Defendant owed Kaspers over $250,000.00 in hourly attorneys' fees and expenses under the Retainer Agreement. On November 11, 2015, the Defendant exchanged emails with her daughter, who is an attorney. Those emails

included highlighted copies of the Retainer Agreement and the State Bar of Georgia's ethics rules regarding attorneys' fees and client communications. Kaspers later determined that it incorrectly calculated its fees using standard hourly rates rather than the reduced rates set forth in the Retainer Agreement. On March 29, 2016, Kaspers sent the Defendant a corrected invoice for $163,102.68, representing $151,485.00 fees and $11,617.68 expenses. The Defendant responded to this invoice by making one payment to Kaspers in the amount of $150.00.

On July 29, 2016, Kaspers initiated a civil action ("Collection Action") against the Defendant in the USDC, asserting claims of breach of contract, detrimental reliance and unjust enrichment, and quantum merit and seeking judgment in the amount of $172,954.39[5] plus interest and costs. The Defendant asserted counterclaims against Kaspers for legal malpractice, breach of fiduciary duty, and breach of contract. The USDC dismissed the breach of contract counterclaim and granted summary judgment in favor of Kaspers on the legal malpractice and breach of fiduciary counterclaims. In February 2019, the USDC scheduled Kaspers' claims in the Collection Action for trial; however, the trial was stayed by the Defendant's bankruptcy petition.

<u>Defendant's Education and Employment History</u>

The Defendant has a Bachelor of Arts degree from North Carolina State University and an Accelerated MBA certificate from the Goizueta Business School at Emory University. She worked as a vice-president in business development and enterprise sales at Telemetrics from approximately 2008 until 2010 and at Web.com (formerly Network Solutions) from approximately 2010 until 2013. For each of these positions, the Defendant was making more than $200,000.00 annually in salary and commissions.

---

[5] This amount includes interest accrued on the $163,102.68 invoiced by Kaspers from the due date of the invoice until the commencement of the Collection Action.

Following her termination from Web.com in September 2013, the Defendant remained unemployed until approximately July 2015, when she became employed with the Children's Museum of Alamance County in Graham, North Carolina. This employment lasted until approximately September 2016, during which time the Defendant received approximately $48,367.00 in net income.

In 2017, the Defendant worked as an adjunct professor at Elon University, teaching classes in sales and marketing and earning net income of approximately $19,594.00. Since September 2018, the Defendant has been employed as a field marketing manager with Spectrum Reach of Charter Communications ("Charter"). Her initial annual salary was $80,000.00, and her current annual salary is approximately $82,000.00. The Defendant is eligible for and has received occasional bonuses from Charter. From the beginning of her employment with Charter until filing her bankruptcy petition, the Defendant received approximately $18,528.00 in net income.

### Defendant's Additional Income

*Sale of Atlanta Residence*

In February 2015, during the pendency of the Employment Action, the Defendant sold her unencumbered residence in Atlanta, Georgia and deposited proceeds of $301,457.99 into a High Yield Savings Account ("Savings Account") with Wells Fargo, N.A. ("Wells Fargo"). On November 1, 2015, the Savings Account had a balance of $297,716.23. She was solvent on that date solvent with liabilities being approximately $10,000.00 in credit card debt.

*Income Tax Refunds*

The Defendant received the following income tax refunds totaling $10,174.00 from the Internal Revenue Service: $1,639.00 on April 27, 2016; $3,900.00 on April 26, 2017; and $4,635.00 on April 25, 2018.

*Insurance Proceeds*

In May 2016, the Defendant hit a deer while driving, and her automobile was a total loss. State Farm Mutual Automobile Insurance Company issued a check to the Defendant on September 15, 2016 in the amount of $19,618.89 as insurance compensation for the vehicle.

Defendant's Cash Withdrawals

Between December 7, 2015 and February 29, 2016, the Defendant withdrew cash totaling $208,600.00 ("Cash Withdrawals") from her bank accounts. The Cash Withdrawals include the following twenty-one cash withdrawal from the Savings Account totaling $203,800.00:

| Date of Withdrawal | Amount Withdrawn |
| --- | --- |
| 12/7/2015 | $9,500.00 |
| 12/14/2015 | $9,500.00 |
| 12/17/2015 | $9,500.00 |
| 1/20/2016 | $9,800.00 |
| 1/27/2016 | $9,900.00 |
| 1/29/2016 | $9,500.00 |
| 2/1/2016 | $9,500.00 |
| 2/1/2016 | $9,500.00 |
| 2/4/2016 | $9,900.00 |
| 2/5/2016 | $9,900.00 |
| 2/8/2016 | $9,900.00 |
| 2/8/2016 | $9,900.00 |
| 2/9/2016 | $9,900.00 |
| 2/11/2016 | $9,900.00 |
| 2/16/2016 | $9,500.00 |
| 2/17/2016 | $9,900.00 |
| 2/18/2016 | $9,900.00 |
| 2/22/2016 | $9,500.00 |
| 2/25/2016 | $9,900.00 |
| 2/26/2016 | $9,500.00 |
| 2/29/2016 | $9,500.00 |
| **Total:** | **$203,800.00** |

The Cash Withdrawals also include the following automated teller machine cash withdrawals from the Defendant's PMA Premier Checking Account with Wells Fargo:

| Date of Withdrawal | Amount Withdrawn |
|---|---|
| 12/21/2015 | $800.00 |
| 12/29/2015 | $800.00 |
| 1/4/2016 | $800.00 |
| 2/3/2016 | $800.00 |
| 2/24/2016 | $800.00 |
| 2/7/2016 | $800.00 |
| **Total:** | **$4,800.00** |

The Defendant explained the Cash Withdrawals by stating that she generally distrusted banks and wanted to have cash on hand so that she could purchase a home being sold in foreclosure, believing that only cash is accepted at foreclosure sales. The Defendant testified that she kept the Cash Withdrawals either in her purse, glove compartment, or a bag she kept in her car and used the money to pay for personal living, travel, and entertainment expense.

Defendant's Expenses

During her employment with Telemetrics and Web.com, the Defendant resided in Atlanta, Georgia. Following her termination from Web.com, the Defendant left Atlanta and began living with various friends and family in and around Burlington, North Carolina, which is where she was reared. In June 2018, the Defendant unsuccessfully bid on a house being sold at foreclosure. On July 31, 2018, the Defendant purchased her current residence located in Burlington, North Carolina for $225,600.00. The Defendant financed $180,000.00 of this purchase price with a loan from William Teague, Sr. From the time the Defendant sold her home in Atlanta until she purchased the home in Burlington, the Defendant did not have any direct housing expenses.

The Defendant does not keep records of her expenses and spending beyond what is necessary for tax reporting purposes. She does not operate business and believes that her record keeping is normal for an ordinary consumer. On January 6, 2021, the Defendant executed an Amended Affidavit of Susan Holland ("Affidavit") in which she attests, based upon her

recollection and produced receipts, invoices, and bank statements, to the use of the Cash Withdrawals and other income as follows:

| Date | Payee | Purpose | Amount |
|---|---|---|---|
| 11/28/2015 | Wells Fargo | Visa payment | $3,742.58 |
| 8/2/2016 | Carter Bank | Cash redeposited | $1,000.00 |
| 9/2016 | Frank Beltran[6] | Legal fees | $10,000.00 |
| 10/19/2016 | Carter Bank | Cash redeposited | $7,000.00 |
| 12/2016 | Aaron Park | Oral surgery fees | $2,975.00 |
| 12/2016 | Jones & Haley[7] | Legal fees | $3,000.00 |
| 12/2016 | Frank Beltran | Legal fees | $5,000.00 |
| 1/5/2017 | Carter Bank | Cash redeposit | $1,200.00 |
| 2/2017 | Frank Beltran | Legal fees | $11,000.00 |
| 2/2017 | Jones & Haley | Legal fees | $8,000.00 |
| 2/2017 | Jones & Haley | Legal fees | $4,000.00 |
| 5/11/2017 | Carter Bank | Cash redeposit | $1,100.00 |
| 7/2017 | Neiman Marcus | Shopping | $871.20 |
| 8/18/2017 |  | Security deposit for short-term rental | $1,000.00 |
| 8/30/2016 | Wells Fargo | Cash redeposited | $500.00 |
| 10/2017 | Roth IRA | Contribution | $6,500.00 |
| 10/10/2017 | Wells Fargo | Cash redeposited | $1,000.00 |
| 3/14/2018 | Carter Bank | Cash redeposited | $400.00 |
| 3/14/2018 | Carter Bank | Cash redeposited | $400.00 |
| 4/17/2018 |  | Dental fees | $148.00 |
| 6/2018 | Alamance County Clerk of Court | Failed foreclosure bid | $2,467.06 |
| 6/29/2018 | Wells Fargo | Cash redeposited | $300.00 |
| 7/2018 | Reynolds Bailey and Carli Webb | Purchase of home in Burlington, NC | $43,215.00 |
| 7/30/2018 | Carter Bank | Cash redeposited | $280.49 |
| 7/31/2018 | MW Crowson | Property insurance | $785.00 |
| 8/2018 | Carolina Supply | Water heater | $1,461.03 |
| 8/28/2018 | Carter Bank | Cash redeposit | $2,000.00 |
| 8/28/2018 | Carter Bank | Cash redeposit | $2,000.00 |
| 2018 | Sammy Barnes | Water heater installation | $1,050.00 |
| 9/2018 | Burlington Carpet |  | $5,667.07 |
| 9/2018 | Duggins Mechanical | Auto work | $1,760.00 |
| 11/2018 | Silver State Imports | Purchase of vehicle | $5,300.00 |
| 11/2018 | Erie Insurance | Auto insurance | $800.00 |
| 12/2018 | Ivey Motorcars | Vehicle inspection | $129.21 |

---

[6] The Defendant consulted with Mr. Beltran about the enforceability of the Retainer Agreement and a potential malpractice action against Kaspers.

[7] Jones & Haley, P.C. represented the Defendant in the Collection Action.

8

| 2018 | Sawyer Exterminating | | $200.00 |
|---|---|---|---|
| 2019 | Alamance County | Property tax | $1,614.13 |
| 2/2019 | Roth IRA | Contribution | $4,000.00 |
| Various | Miscellaneous | Vet bills, hotels, etc. | $1,077.40 |
| **Total:** | | | **$142,943.17** |

The Plaintiffs discredited a few of the Affidavit's included line items. For instance, some of the "cash redeposits" appear to have been immediately used for the payment by check of legal fees listed in the Affidavit. Additionally, the Defendant was refunded her foreclosure bid, and a couple of cash redeposits are duplicated in the Affidavit. Despite the inaccuracies, for the purpose of their arguments, the Plaintiffs accepted the Defendant's total of $142,943.17 as an explanation of how she spent her money between Kaspers' initial request for payment under the Retainer Agreement and the date of her bankruptcy petition; therefore, the court will find $142,943.17 to be a factual representation of the Defendant's documented spending.

CONCLUSIONS OF LAW

Jurisdiction

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J) which the court has the authority to hear and determine pursuant to 28 U.S.C. § 157(b)(1). The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference entered on August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

Chapter 7 Discharge

The United States Supreme Court has long held that—

[o]ne of the primary purposes of the Bankruptcy Act[8] is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at

---

[8] United States bankruptcy legislation is now more commonly referred to as the Bankruptcy Code after Congress made substantial changes with the Bankruptcy Reform Act of 1978.

9

the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (quoting *Williams v. U.S. Fidelity & Guar. Co.*, 236 U.S. 549, 554-55 (1915) (other citations omitted)). In Chapter 7, the discharge provided to individuals by § 727 "is the heart of the fresh start provisions of the bankruptcy law." H.R. REP. NO. 95-595, at 384 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6340. "The solicitude of Congress, however, stops at the debtor who does not measure up to that appealing image ['honest but unfortunate debtor'] and who has engaged in grossly irresponsible or fraudulent conduct, has been recalcitrant during the case or has over-utilized the privilege." *Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 982 (Bankr. E.D.N.C. 1987) (quoting STEPHAN RIESENFELD, CREDITORS' REMEDIES AND DEBTORS' PROTECTIONS 729 (3d ed. 1979)).

In Chapter 7 cases, the court shall grant the debtor a discharge unless one of seven enumerated exceptions set forth in § 727(a) applies. The Plaintiffs alleged causes of action under §§ 727(a)(3), 727(a)(4)(A), 727(a)(4)(D), 727(a)(5) and 727(a)(6)(A) but announced at the trial that they were only proceeding under §§ 727(a)(3), 727(a)(4)(A), and 727(a)(5). "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Fed. R. Bankr. P. 4005. Although the burden may shift to a debtor to provide satisfactory, explanatory evidence once the plaintiff objecting to discharge establishes a *prima facie* case, the ultimate burden rests with the plaintiff. *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994).

*§ 727(a)(3)*

The court begins its analysis with §727(a)(3) which provides that a debtor is not entitled to a discharge if—

10

>the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. §727(a)(3). "Thus, a party objecting to a bankruptcy discharge petition on this basis must make an initial showing that (1) the debtor failed to keep and preserve adequate financial records, and (2) such a failure makes it impossible to ascertain the debtor's financial condition." *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 354 (4th Cir. 2007).

A debtor is not required to maintain perfect records; however, a debtor is "obliged by the statute to preserve sufficient and adequate financial records to enable the court and the parties to reasonably ascertain an accurate picture of his financial affairs." *Id.* at 355. As articulated by the neighboring United States Bankruptcy Court for the District of South Carolina, "[n]either the objecting party nor the Court is required to reconstruct the financial trail; the evidence must be sufficient to account for debtor's financial condition and business transactions without requiring the creditor to reconstruct the history through a maze of transactions and business entities." *LM Ins. Corp. v. De Caris (In re De Caris)*, 585 B.R. 787, 792 (Bankr. D.S.C. 2018) (quoting *Transworld, Inc. v. Volpe (In re Volpe)*, 317 B.R. 684, 690 (Bankr. D.S.C. 2003)). "In determining whether a debtor maintained sufficient records, the court may consider a variety of factors including the level of a debtor's sophistication, the complexity of the debtor's transactions, the lack of timeliness of a debtor's disclosure of records, and any other relevant circumstances." *Angell v. Williams (In re Williams)*, No. 08-00188, 2010 WL 364459, at *6 (Bankr. E.D.N.C. Jan. 27, 2010) (citing *In re French*, 499 F.3d at 355)).

In the four years preceding her bankruptcy petition, the Defendant had access to at least $417,739.88 which is the total of $301,457.99 received from the sale of her Atlanta residence,

11

employment income of $86,489.00,[9] $10,174.00 in tax refunds, and $19,618.89 of insurance proceeds. The Defendant reported only having $2,528.66 available at the time of her petition, and during this same period, the Defendant's unsecured debt increased from approximately $10,000.00 to almost $200,000.00, which is exclusive of the disputed debt to Kaspers. As detailed in her Affidavit, the Defendant could only produce financial records to account for $142,943.17, of which $43,215.00, or approximately 30%, represents the down-payment on her residence in Burlington. The Affidavit only accounts for approximately 34% of the $417,739.88 available to the Defendant. No other records that document the diminution of liquid assets exist.

In *Neary v. Hughes (In re Hughes)*, 353 B.R. 486 (Bankr. N.D. Tex. 2006), the debtor did not maintain bank accounts to avoid garnishment in satisfaction of judgments against him and instead conducted his financial affairs in cash, which he kept in a drawer. He admittedly kept no record of his financial transactions. In denying discharge under § 727(a)(3), the United States Bankruptcy Court for the Northern District of Texas dismissed the debtor's explanations for why he operated in cash as irrelevant and found that—

> [e]ven if Mr. Hughes was attempting to avoid the effects of judgment liens by avoiding to keep a bank account, in favor of a drawer in his house, this does not explain why Mr. Hughes did not keep a simple ledger of the funds deposited into that drawer and withdrawn from that drawer. Mr. Hughes testified that the funds in the drawer were used for household expenses. It would have been very easy for Mr. Hughes to go to the local dime store and purchase a ledger, and record deposits of funds into the drawer and withdrawals of funds from the drawer. Mr. Hughes is a well-educated man, holding a degree in finance from a well-respected university. He is a sophisticated business man, having dealt in multi-million dollar transactions for many, many years. As such, Mr. Hughes is held to a higher record-keeping standard than one not so financially savvy. Failure to justify why he did not track the receipt and expenditure of literally thousands of dollars each month is not justified.

---

[9] This amount represents the sum of her net income of $48,367.00 from the Children's Museum of Alamance County, $19,594.00 from Elon University, and $18,528.00 from Charter. The Plaintiffs contend that the Defendant actually received closer to $120,000.00 in net salary during this time period, and the Defendant acknowledged in her testimony that the $120,000.00 figure was probably accurate.

*Id.* at 502-03.

Similarly, the Defendant is well-educated and holds a graduate certificate in business administration. She has also taught at the university level. The Defendant has an illusion that her withdrawal, use, and accounting of the cash was normal for an ordinary consumer. This court can recall no other debtor who had a propensity for stashing thousands of dollars in a bag in a car trunk. The systematic withdrawal of cash as performed by the Defendant is far from ordinary consumer behavior.[10] The Defendant had ulterior motives. Whatever her reasons for making the Cash Withdrawals, she should have kept records tracking her disposition of the Cash Withdrawals, as well as non-cash transactions. Keeping these records becomes a necessity when seeking relief from this court. As eloquently explained by the *Hughes* court:

> It has been said many times that receiving a discharge in bankruptcy is a privilege, not a right. In order to have entitlement to that privilege, certain basic financial record keeping by the debtor is of paramount importance. Record keeping is required for parties in interest to be able to verify the accuracy of the sworn Schedules and SOFAs[11] and to be certain that the disclosures are materially accurate. If there are insufficient records, then there is no way to have a check on the integrity of the Schedules and SOFAs. The integrity of the bankruptcy process depends upon having some reasonable and reliable paper trail. The regrettable consequence of failure to have adequate records must be the denial of a discharge.

*Id.* at 502. The Defendant's failure to maintain records that would explain how she spent approximately two-thirds of funds available to her within the four years prior to her bankruptcy petition warrants denial of her discharge under § 727(a)(3).

---

[10] In today's world, a strict reliance on cash is quite antiquated. The days of a pocket full of cash have evolved into the convenient and practical bank debit card or institutional credit card. The swipe and tap have replaced the fanning of dollars at the cash register, or more appropriately, the point of sale. Not long ago only those with the best of credit scores were rewarded with a plastic card that could mean instant financial resources. Today, opportunities for credit and debit cards are endless, leading some irresponsible users to this court; however, debit and credit cards provide outstanding detail of their use. Spending can be itemized, and accounting of that spending is available electronically or on paper. Many believe that "plastic credit" give freedom and convenience, while others believe that the use of the debit and credit cards leaves a permanent electronic trail revealing too much to too many.

[11] SOFA is an acronym for a debtor's Statement of Financial Affairs.

*§ 727(a)(5)*

A debtor is also not entitled to a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). This section "is designed to work in tandem with § 727(a)(3), to foster the same process of investigation and disclosure [promoted by § 727(a)(3)], by requiring a debtor to give a satisfactory explanation of his insolvency, after the commencement of the bankruptcy case." *Panuska v. Johnson (In re Johnson)*, 80 B.R. 953, 960 n. 8 (Bankr. D. Minn. 1987) (citations omitted). The debtor's explanation does not need to be comprehensive but "must consist of more than [a] vague, indefinite, and uncorroborated hodgepodge of financial transactions," and it must convince the court that the debtor has not concealed assets. *First Comm. Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545-46 (Bankr. N.D. Ill. 2002) (quoting *Baum v. Earl Millikin, Inc.,* 359 F.2d 811, 814 (7th Cir.1966)). The debtor's explanation must be "reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went." *Union Bank of the Middle East, Ltd. v. Farouki (In re Farouki)*, 133 B.R. 769, 777 (Bankr. E.D. Va. 1991), *aff'd Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244 (4th Cir. 1994) (citing *Fed. Deposit Ins. Corp. v. Hendren (In re Hendren)*, 51 B.R. 781, 788 (Bankr. E.D. Tenn. 1985)).

Beyond the rudimentary records provided with the Affidavit, the Defendant attempted in testimony to explain her spending of the Cash Withdrawals and other available income. She stated that after losing her job with Web.com, she continued to live the "Buckhead Lifestyle" which she had enjoyed in Atlanta, with expensive food, wine, travel, entertainment, personal care, and gift expenses. She said that she also frequently gave cash to the homeless, single mothers, artists, and other needy individuals as well as to animal rescue organizations. Although the court imagines

that someone living an extravagant lifestyle and generously giving to others can easily squander over $400,000.00 in four years, the Defendant's explanations are not credible, and it is more likely that she transferred or concealed the Cash Withdrawals to avoid payment to Kaspers. Some of the testimony creates an irreconcilable juxtaposition. Even though the Defendant claims to have lived an extravagant lifestyle, she often resided with friends and family and did not have any significant or documented housing expenses until she purchased her current residence in July 2018.

Other juxtapositions are very logical. The Cash Withdrawals began only a month after Kaspers first requested payment under the Retainer Agreement and continued until the Defendant had withdrawn over $200,000.00 from her bank accounts. After hearing the Defendant's story, the court, like the Plaintiffs, continues to wonder where this money went.

The court does not condemn the use of cash. It is actually good to have. It is reliable and readily accepted. During winter storms, hurricanes, and bad weather, we are reminded to have some cash in case the power is interrupted; however, exclusive use of cash, especially in the amounts expended by the Defendant, raises some question of the motivation for conducting professional or personal business in that form. The motivation for relying on cash transactions becomes more suspect when a large monetary judgment is potentially looming. The extensive and almost exclusive use of the cash by the Defendant, when the Kaspers obligation surrounds her, reeks of ill-intent without a plausible explanation. Those who do not pay their bills are subject to a higher level of scrutiny by their creditors. That scrutiny increases when debtors withdraw large amounts of cash and spend wildly with inadequate accounting, recordkeeping or reconciliation. Without a better explanation and accounting for the Cash Withdrawals, the Defendant cannot escape the scrutiny of her actions; therefore, denial of the Defendant's discharge under § 727(a)(5) is also appropriate.

*§ 727(a)(4)(A)*

Finally, the court will consider § 727(a)(4)(A) which provides for the denial of discharge if "the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The Plaintiffs presented evidence that strongly suggests the Defendant knowingly and fraudulently made false oaths or accounts during her bankruptcy case, and perhaps during the trial of this adversary proceeding. Much of the Defendant's testimony was a rambling monologue and full of inconsistencies, but the court declines to make this conclusion of law, because it has sufficient cause to deny the Defendant's discharge pursuant to §§ 727(a)(3) and 727(a)(5).[12]

END OF DOCUMENT

---

[12] "[T]he intent to deceive is not a requisite element for denying a discharge under § 727(a)(3) and § 727(a)(5)." *Bodenstein v. Wasserman (In re Wasserman)*, 332 B.R. 325, 335 (Bankr. N.D. Ill. 2005).